NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0487n.06
Filed: June 10, 2005

Nos. 04-1157, 04-1380

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| MICHAEL OSTRANDER; ROBERT | ) | |
| OSTRANDER, | ) | **APPENDIX** TO |
| | ) | PUBLISHED OPINION |
| Defendants-Appellants. | ) | |

Before: BOGGS, Chief Judge; and KENNEDY and MARTIN, Circuit Judges.

BOGGS, Chief Judge. We begin this unpublished appendix by reciting the remaining relevant facts. The murder of Hansle Andrews did not remain a mystery very long. After a missing-person report was filed on Andrews, the local police called in the assistance of the FBI. Within a few days after Robert had left Andrews's truck with his wife, Misty, in Las Vegas, the police located the truck and traced it back to her. FBI Special Agent Robert BirdSong worked the case for nearly one year, accumulating through forensic evidence and a confidential informant an almost complete knowledge of the events of August 12, 2000. On July 26, 2001, an arrest warrant for Michael Ostrander was issued in the Western District of Michigan. On August 2, 2001, FBI agents in Flint, Michigan located and arrested him.

-1-

The agents arrested Michael around 2:30 p.m. Rather than take Michael before the magistrate, however, the agents took him back to the FBI office. They placed him in an interrogation room that was approximately eleven by sixteen feet. It had a window covered by a shade on one wall and a one-way mirror on another. The room was air conditioned. The agents sat Michael in a chair and cuffed his left wrist to a bar built into the wall. The bar was set immediately above a table so that he could rest his arm on the table. Michael's right hand was not cuffed. The agents allowed Michael to smoke, and they got him a soda at his request.

At some point immediately following the arrest, an agent from the Flint office contacted Agent BirdSong in Traverse City and told him that Michael had been arrested. BirdSong asked the Flint office to begin the interrogation and to keep Michael until he arrived approximately three to four hours later.

At 2:40 p.m., the Flint agents read Michael the FBI's standard "Advice of Rights" form. This form says:

> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning
> if you wish.
> If you decide to answer questions now without a lawyer present, you have the right
> to stop answering at any time.
>
> WAIVER OF RIGHTS
> If have read this statement of my rights and I understand what my rights are. At this
> time, I am willing to answer questions without a lawyer present.

The agent testified that he read the form to Michael, as well as letting him read it himself–after ascertaining that Michael knew how to read. Michael thought about the form for a few minutes and signed it at approximately 2:45 p.m. He claimed that he asked for an attorney, but the district court accepted the agents' testimony that he did not. The agents then began the interview.

The Flint agents testified that they did not coerce Michael into signing the form, and that they did not raise their voices or threaten him physically during the interview. Between 2:45 and 6:00 p.m., the agents gave Michael two breaks. During the breaks, the agents refrained from asking questions for approximately 20 minutes, although they did not leave the room. At this point, only the two arresting agents were with Michael in the interview room. Both agents were wearing their firearms in visible holsters.

At first, Michael denied all involvement in the murder of Hansle Andrews. However, he did admit that he was involved in drug trafficking, that his brother Robert was also involved in trafficking, that Robert had lost $9000 around February 2000, "and he mentioned that ever since then neither he nor Robert had messed with drugs."

Shortly after this admission, at around 6:00 p.m., Agent BirdSong and Detective O'Riley of the Wexford County Sheriff's Department arrived. Michael was left alone for a few minutes as the Flint agents briefed BirdSong and O'Riley on the progress of the interviews. At approximately 6:20 p.m. Michael was allowed to use the bathroom.

Before recommencing the interview, BirdSong re-Mirandized Michael, because, BirdSong testified, given the "gravity of the charge" he wanted to be especially careful. At 6:29 p.m., Michael was again presented with an "Advice of Rights" form, which BirdSong read to him and then gave

him a chance to read. At 6:32 p.m., Michael signed the form. BirdSong advised Michael of the charges against him, something the Flint agents had already done, and Michael asked about the possible penalties. BirdSong told him he faced possible life in prison, the death penalty, or any term of years. BirdSong testified that he did not use the death penalty as a threat to coerce Michael into speaking and that he kept the tone "conversational." He also testified that Michael "asked some pretty intelligent questions about the penalty." The agent told him that "by cooperating, . . . he could only help himself, that he wasn't going to do himself any good by not making a statement to us. We already had the facts. We had conducted an intensive investigation over a long period of time, and the case was going to go forward." When Michael asked if the death penalty could be taken off the table, the agent responded that under the Sentencing Guidelines there was a provision for acceptance of responsibility and that federal courts rarely imposed the death penalty.

Very soon after BirdSong began to interview him, Michael began to talk about his role in the murder. For example, he drew a map of the murder scene. However, it was only at approximately 9:20 p.m. that he gave the agents what they believed was the true story. At 9:41 p.m. the agents left him alone for approximately 10 minutes to write a statement. The interview concluded at approximately 10:15 p.m., and Michael was transported to the Genesee County Jail. He was brought before a magistrate the following day at 2:00 p.m.

The agents believed that Michael was not under the influence of drugs or alcohol during the interview. They allowed him breaks, they allowed him to smoke, and they offered him soda and candy, which, other than the initial soda, he refused. They also testified that they did not leave him alone for extended periods of time, as Michael claimed in an affidavit.

–4–

Using Michael's confession, BirdSong obtained an arrest warrant for Robert, who was arrested on August 9, 2001.

Michael, in a pretrial suppression motion, claimed that his statements to the FBI agents were involuntary. Both sides briefed the issue, a hearing was held at which the agents and Michael's initial court-appointed attorney testified, and the judge ruled that there was no basis for suppressing the statements.

In addition, three times during the course of the trial, Michael made motions to dismiss the Hobbs Act charge. The first motion came prior to trial. At the close of the prosecution's case, Michael made a motion for acquittal under Rule 29, Fed. R. Crim. P. on the basis of insufficient evidence to convict. After the jury reached its verdict of guilty on all three counts, Michael moved for a Judgment of Acquittal or a New Trial, this time on both the Hobbs Act and the murder-in-relation-to-a-drug-trafficking-crime charges. The district court denied each motion.

Prior to his trial, Robert also moved to dismiss both the Hobbs Act and the murder-in-relation-to-a-drug-trafficking-crime charges, and at the conclusion of the prosecution's case, he made a motion for acquittal on these charges under Rule 29. The court denied both motions. Robert was also sentenced to life in prison without possibility of release.

Both Ostranders filed timely appeals, claiming that the jury had insufficient evidence (1) to find the requisite nexus with interstate commerce necessary to convict under the Hobbs Act, and (2) to find that the murder was related to a drug crime. Michael also appeals the murder-in-relation-to-a-drug-trafficking-crime count on the grounds that there was insufficient evidence to find him guilty of aiding and abetting the murder. Robert makes an as-applied constitutional challenge

contending that under the Commerce Clause, 18 U.S.C. § 924(c) and (j) were unconstitutionally applied to his case because they criminalized exclusively intrastate crimes. Michael also appeals the denial of his motion to suppress his confession.

**I**

We consider the various sufficiency of the evidence claims first. The court reviews a sufficiency of the evidence claim *de novo*, considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *United States v. Wood*, 364 F.3d 704, 716 (6th Cir. 2004). The Appellant's burden is very heavy because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor. *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002); *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000).

Both Appellants contend that the jury heard insufficient evidence to convict them on the violation of the Hobbs Act. The Hobbs Act punishes a person who "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation" of the Act. 18 U.S.C. § 1951(a). Thus to prevail under the Act, the Government must prove two elements: (1) interference with interstate commerce (2) in the course of a substantive criminal act. If the victim of the robbery or violence is a business entity, the effect on interstate commerce need only be *de minimis*. *United States v. Smith*, 182 F.3d 452, 456 (6th Cir. 1999).

Appellants argue that Hansle Andrews acted as a private individual buying drugs for his own purposes, and that, therefore, the Government failed to meet its burden of showing a sufficient nexus with interstate commerce under the standard for non-business entities enunciated in *United States v. Wang*, 222 F.3d 234, 239-40 (6th Cir. 2000) ("[W]hen the Government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one--not one that is fortuitous or speculative.").

However, Appellants' reliance on *Wang* is misplaced. In that case, the victims owned a restaurant that bought some of its supplies from out-of-state suppliers. One night, the victims took some money from the cash register, intending to deposit it in the bank the following day, and drove home. Upon their arrival, they were accosted by robbers who lay in wait and who made off with $4200, only $1200 of which came from the restaurant receipts. The court held that the theft was too attenuated from the interstate commerce connections of the restaurant to support a Hobbs Act conviction. *Id.* at 238. The victims were robbed in their home; only some of the money came from the business; only a small amount of money was stolen; and the government showed no actual effect on interstate commerce. For instance, the restaurant did not shut down and the owners did not cease to order goods in interstate commerce. *Id*. at 237, 240.

The murder of Hansle Andrews does not mirror these unique facts. Hansle Andrews was a drug dealer; that was his business, and indeed he was the business. He bought and sold marijuana and cocaine. In his testimony, Robert admitted to selling large quantities of marijuana to Andrews on multiple occasions, which encouraged Andrews to believe Robert's false promise to sell him 6

pounds of marijuana, hardly an amount one would buy for purely personal, recreational use. On the

day he was murdered, Andrews expected to accompany Robert to Grand Rapids for the drug buy.

The fact that Robert diverted him to the woods on the pretense of meeting up with Michael is

irrelevant. The detour was supposedly just a stop in the course of a buying trip such as any supplier

of goods might make. Similarly, the fact that Robert did not actually have drugs to sell Andrews

and that the men were standing in the middle of the woods with no drugs around at the moment of

the murder does not mean, as Appellants would have us believe, that the jury could not find that

Andrews left home that day intending to buy drugs that he would later sell as part of his drug-

dealing business.

The prosecution offered evidence that the cocaine and marijuana Hansle Andrews sold

originated in Latin America, and thus had to get to Michigan through interstate commerce. *See*

*United States v. Bailey,* 227 F.3d 792, 798 (7th Cir. 2000) (drugs imported from South America held

to have traveled in interstate commerce). In addition, illegal commerce counts as commerce for

Hobbs Act purposes. *United States v. McFarland,* 311 F.3d 376, 401 (5th Cir. 2002) (en banc);

*United States v. Marrero*, 299 F.3d 653, 654 (7th Cir. 2002) ("any argument that the Hobbs Act, or

Congress's commerce power . . . does not reach robberies that disrupt rather than promote illegal

trafficking in drugs is foreclosed by the case law") (internal citations omitted); *United States v.*

*Peterson*, 236 F.3d 848, 854 (7th Cir. 2001). In this case, the robbery and  murder obviously

reduced the amount of drugs Andrews could buy and sell in interstate commerce. *See Bailey,* 227

F.3d at 798 (for purposes of Hobbs Act, "robbery of cocaine dealers generally has an effect on

commerce"). Therefore, we hold that the Government met its burden of proof of showing a Hobbs Act violation.

Appellants also argue that the jury heard insufficient evidence to convict them on the 18 U.S.C. § 924(c) and (j) charge of murder during and in relation to a drug trafficking crime. Section 924(j) mandates in relevant part that: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall– (1) if the killing is a murder . . ., be punished by death or by imprisonment for any term of years or for life." Section 924(c) makes it a violation to use or carry a firearm in furtherance of a drug trafficking crime. A violation of § 924(j) is thus a violation of § 924(c) that results in murder caused by a firearm. A violation of § 924(c) requires proof not only that the defendant used or carried a firearm while engaging in a drug trafficking offense, but also that the firearm had "some purpose and effect with respect to the drug trafficking crime . . . .'" *United States v. Layne*, 192 F.3d 556, 571 (6th Cir. 1999) (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)). We analyze that purpose and effect in terms of the "'totality of the circumstances surrounding the commission of the crime.'" *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999) (quoting *United States v. Brown*, 915 F.2d 219, 226 (6th Cir. 1990)).

Appellants focus on the fictitious sale of the non-existent drugs to argue that, since Andrews could not have bought drugs because the Ostranders had none to sell, they were not engaged in a drug trafficking offense at the moment they killed Andrews. To bolster this argument, Appellants cite *United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999). In *Gibbs*, the defendant sold crack to an undercover agent. The agent left defendant and returned to his car. At that point, defendant called

the agent back and sold him more crack. The agent left again and was summoned back again on the pretext of getting more crack. Instead, the defendant went into a third person's house, retrieved a gun, and returned to the agent, whom he then robbed. *Id.* at 426. The court found that this was not a § 924(c)(1) violation. The court reasoned that "[a]ttracting a person with the allure of a drug sale and then robbing the person is not enough to qualify as use of a firearm in relation to a drug sale." In particular, the court found that the firearm was used in relation to the robbery but not in relation to the drug crime. *Ibid.*

*Gibbs* fails to help Appellants because they are focusing on the wrong crime. The drug trafficking crime at issue in this case is not the fictitious drug sale but rather the on-going drug conspiracy of which Robert and Michael were convicted in count one, and which the robbery of Andrews was intended to facilitate. In *Gibbs*, the court accepted the defendant's claim that the robbery was not intended to further his drug business but was instead a separate crime. In Robert's case, by contrast, the jury heard evidence that Robert planned and committed the robbery and murder with the intent to acquire money to rebuild his drug business. Thus, not only did he lure Andrews with the promise of a drug sale, not only did Andrews raise the money by calling in debts owed to him by drug buyers, not only did Robert use some of the money to pay off a drug-related debt, and not only did Robert choose Andrews because he had ready money from dealing drugs, but Robert also told people that the purpose of the crime was to further his own drug trafficking. Among those people were Michael and Jon Mercer, Robert's salesmen, who would profit from the rebuilding of Robert's business. Here again we find that a rational juror had sufficient evidence to find that the robbery and murder occurred during and in relation to Robert's drug trafficking.

Next, Michael claims that, while he might have been guilty of uncharged crimes such as being an accessory after the fact, he did not aid and abet the murder itself.  "Aiding and abetting has been described 'as one's desire to in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed.'" *Rattigan v. United States*, 151 F.3d 551, 557-58 (6th Cir. 1998) (quoting *United States v. Morrow,* 977 F.2d 222, 230 (6th Cir. 1992) (en banc) (additional internal quotation marks omitted).

Michael discussed the plans with Robert two days in advance; he borrowed his girlfriend's car for the occasion; he transported the gun and the latex gloves to the scene.  When Robert and Andrews arrived, Michael distracted Andrews so that Robert could retrieve the gun unnoticed. Michael knew what Robert planned to do with the gun and therefore what role he was playing as an accomplice.  Michael helped get rid of the body and other incriminating evidence.  Robert professed to want to murder Andrews in order to get money to restart his drug business.  Michael was Robert's main dealer, so he would profit from the robbery as well.  Thus, he associated himself with the venture, his actions helped it come about, and he expected to profit from its success.  The fact that Michael did not actually pull the trigger does not mean that no rational juror could have found that Michael aided and abetted his brother in the murder of Hansle Andrews.

## II

Robert contends that under the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3, the statutes of conviction, 18 U.S.C. §§ 924(c) and (j), are unconstitutional both facially and as applied to his case because they criminalize exclusively intrastate crimes.  He acknowledges that this court has recently rejected a facial challenge to the constitutionality of § 924(c). *United States v. Ricketts*, 317

F.3d 540, 543 (6th Cir.), *cert. denied*, 539 U.S. 935 (2003) ("We believe that 18 U.S.C. § 924(c) falls squarely within Congress' Commerce Power.") Therefore, Appellant focuses on his as-applied challenge.

Constitutional challenges to criminal statutes are reviewed *de novo. United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001). "However, '[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'" *Ibid.* (quoting *United States v. Morrison,* 529 U.S. 598, 607 (2000)).

Robert argues that § 924(c) and (j) were unconstitutionally applied to him because the Government failed to show a more than *de minimis* connection to interstate commerce. Since he contends that Andrews was buying drugs in his capacity as a private individual, a *de minimis* impact on interstate commerce would be insufficient to meet the higher interstate commerce nexus requirement under *Wang*, 222 F.3d at 239-40. As discussed above, we find that Andrews was legitimately characterized as engaged in business when he accompanied Robert into the woods. Therefore, the *Wang* private individual exception does not apply and Robert's constitutional challenge fails.

### III

We turn finally to Michael's claim that his confession should have been suppressed. In considering district court rulings on suppression motions, we review findings of fact for clear error and conclusions of law *de novo. United States v. Akridge*, 346 F.3d 618, 622 (6th Cir. 2003). The court's denial of the motion to suppress is considered in a "light most favorable to the government."

*United States v. Harris,* 255 F.3d 288, 291 (6th Cir. 2001).  Findings of fact are affirmed unless the reviewing court has a "'definite and firm conviction that a mistake has been committed.'" *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

The FBI agents arrested Michael Ostrander at approximately 2:30 p.m. on August 2, 2001. They took him back to the FBI office, which was located a few blocks from the federal courthouse where a magistrate judge was sitting until 4 p.m.  The agents from Flint and later Agent BirdSong and Detective O'Riley interrogated Michael from approximately 2:45 p.m. until approximately 10:15 p.m. the same day.  Michael signed *Miranda* waivers at the commencement of the 2:45 p.m. interrogation session and at the commencement of the 6:00 p.m. session.  The sessions apparently proceeded "conversationally," without threats or promises, and Michael was given the opportunity to take breaks and to use the bathroom.  Michael spent the night at the county jail and was first brought before a magistrate the next afternoon at 2:00.

In considering Defendant-Appellant's motion to suppress his confession, the district judge relied on the interpretation of 18 U.S.C. § 3501 that we employed in *United States v. Christopher,* 956 F.2d 536, 538 (6th Cir. 1991) and *United States v. Mayes*, 552 F.2d 729, 734 (6th Cir. 1977). This statute, passed in 1968 as part of the Omnibus Crime Control and Safe Streets Act, presents certain difficulties.  The statute reads, in relevant part:

> **(a)**  In any criminal prosecution brought by the United States or by the District of Columbia, a **confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given**. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily

made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

**(b)** The trial judge in determining the issue of voluntariness shall take into consideration **all the circumstances surrounding the giving of the confession**, including (1) the **time elapsing between arrest and arraignment** of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need **not be conclusive on the issue of voluntariness** of the confession.

**(c)** In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, **shall not be inadmissible solely because of delay in bringing such person before a magistrate** judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia **if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention**: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501 (emphases added).

Read literally, § 3501(a) contradicts § 3501(c). Sub-section (a) states that all confessions are admissible if voluntary, while sub-section (c) places a six-hour time limit below which voluntary confessions are considered *per se* admissible. Thus sub-section (a) would leave all pre-arraignment

–14–

delays irremediable provided the confession was not coerced. This makes sub-section (c) essentially redundant. To complicate matters further, sub-section (b) makes the delay only one factor in considering voluntariness. *See United States v. Perez*, 733 F.2d 1026, 1031, 1034 (2d Cir. 1984) (describing the interpretation of § 3501 as "somewhat murky" and pointing out that subsection (a) "reads subsection (c) out of the statute"); *United States v. Alvarez-Sanchez*, 975 F.2d 1396, 1400-02 (9th Cir. 1992) (providing extensive discussion of interpretative problems presented by the statute), (*rev'd on other grounds*, 511 U.S. 350 (1994)).

This Circuit has resolved the statutory contradictions by focusing on the voluntariness prong. "The rule in this circuit and in most others is that unnecessary delay, standing alone, is not sufficient to justify the suppression of an otherwise voluntary confession under 18 U.S.C. § 3501, made during that period." *Christopher,* 956 F.2d at 538 (citing *Mayes*, 552 F.2d at 734). Thus, lapse of time is not dispositive, though delays over six hours may be considered. "The court should 'scrutinize for reasonableness delays in excess of 6 hours which are not made necessary by transportation problems.'" *Id*. at 538-39 (quoting *United States v. Wilson*, 838 F.2d 1081, 1085 n.2 (9th Cir. 1988)). We assess reasonableness based primarily on the absence of coercion during the delay such that the confession could be said to be voluntary. *Ibid*.

Accordingly, we focus on the voluntariness of the confession. The government bears the burden of proving by a preponderance of the evidence that a confession was voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992). To establish that a confession was involuntary, we require three elements: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the

crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)); *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003). Factors relevant to determining whether defendant's will was overborne include age, education, intelligence, awareness of rights, length of questioning, and use of physical punishments. *Mahan*, 190 F.3d at 423; *see also United States v. Doe*, 226 F.3d 672, 680 (6th Cir. 2000); *United States v. Weekley*, 130 F.3d 747, 751 (6th Cir. 1997).

In the suppression hearing, the judge heard extensive testimony about the conduct of the interrogation. Although Michael claimed he asked for an attorney and was left alone for long periods, the judge chose to credit the testimony of the FBI agents and Detective O'Riley that neither assertion was true. He found that the agents did not threaten Michael, that they made no false or illusory promises, and that they did not use the threat of the death penalty to coerce him. The judge believed that Michael was adequately instructed on his rights, that he understood the *Miranda* waivers he signed, that he understood the charges against him and their gravity, and that he was allowed sufficient breaks to prevent being overwhelmed by the questioning. The agents testified that Michael asked intelligent questions and took the time to consider whether he wanted to waive his right to an attorney. Furthermore, although Michael only confessed to what the officers believed to have been the actual crime at approximately 9:20 p.m., or less than seven hours after his arrest, he had begun to speak of the crime immediately after Agent BirdSong began to question him soon after 6:00 p.m.

While *Miranda* waivers are not themselves conclusive indicators of voluntariness, *see Moran v. Burbine*, 475 U.S. 412, 421 (1986), when coupled with the judge's findings that Michael was not intimidated or physically abused, that he understood what was going on and what his rights were, and that he began to discuss the crime well within the six-hour safe harbor, concluding his confession only some forty minutes outside this grace period, this court finds that these "valid *Miranda* waiver[s] also waive[d] the prompt judicial warning of [Michael's] constitutional rights." *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982). Therefore, we hold that the district judge's denial of the suppression motion was correct.

**IV**

For the forgoing reasons, we **AFFIRM** Robert and Michael's convictions under 18 U.S.C. §§ 1951(a) and 924(c) and (j). We find that there was no constitutional defect in the application of § 924(c) and (j) to Robert. And we **AFFIRM** the denial of Michael's motion to suppress his confession.