**NOT RECOMMENDED FOR PUBLICATION**
File Name: 10a0041n.06

No.  08-5155

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Jan 25, 2010** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | **ON APPEAL FROM THE UNITED** |
| | ) | **STATES DISTRICT COURT FOR THE** |
| Brian Sean McClendon, | ) | **WESTERN DISTRICT OF KENTUCKY** |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| | ) | |

BEFORE:    MERRITT, MOORE, and GIBBONS, Circuit Judges.

**MERRITT, Circuit Judge.**  Brian McClendon had previously worked at a Wal-Mart in Louisville, Kentucky.   McClendon was convicted for offenses related to his role in the robbery of an armored car guard at the Wal-Mart store and a subsequent drug conspiracy funded by the fruits of that robbery.  He appeals his conviction and sentence  on grounds of insufficient evidence and the unreasonableness of his sentence in addition to certain trial errors.  We find all of his arguments without merit and AFFIRM his conviction and sentence.

**I.  FACTUAL BACKGROUND**

On March 20, 2006, an armed guard employed by AT Systems was leaving a Wal-Mart in Louisville, Kentucky, when he was robbed at gunpoint by two men.  Police arrested three men in connection with the robbery: Brian McClendon, Marcus Capers and Marc Hill.  Both Hill and Capers

cooperated with police and claimed that McClendon was the mastermind behind the robbery. The testimony of Hill and Capers – in connection with surveillance footage and phone records – constituted the majority of proof offered against McClendon. At trial, Capers and Hill testified as to their roles in the robbery. They provided much of the information about the planning and execution of the robbery and drug conspiracy. Their testimony taken together alleges the following events.

McClendon was the first to suggest robbing the Wal-Mart, and McClendon determined all of the details of the robbery including the best date and time. Capers and McClendon alone went to the Wal-Mart on March 13, 2006, allegedly for the purpose of robbing it on that date. However, McClendon called off the robbery after waiting for the armored guard to arrive. He claimed that he did not feel right about it and that they would return at another time. McClendon believed that they needed a third party to help. Consequently, when McClendon saw Hill at the Wal-Mart days before the robbery, he attempted to convince Hill "to do something for him," but did not at that time explain that he was recruiting Hill to help rob the Wal-Mart. The plan was for McClendon to enter the store first to serve as a look-out and inform Capers and Hill – who were to wait outside the store – when to enter. The men were to communicate via cell phone.

On March 20, 2006, Capers and McClendon, arriving in separate cars, met Hill at a gas station near the Wal-Mart. Capers was driving his girlfriend's car, and he switched the car's license plate with a stolen license plate. At this time, Capers informed Hill of the robbery plan. Hill testified that he initially expressed reluctance to participate but later agreed after urging from McClendon. Capers and Hill then drove Capers' girlfriend's car to the Wal-Mart and waited at the

side of the store, while McClendon drove separately to the Wal-Mart. The men all waited for two to three hours for the armored car to arrive. Capers testified that he had two cell phones with him that day and that he and Hill communicated by phone with McClendon throughout this waiting period.

Upon seeing the armored car pull into the restaurant parking lot adjacent to the Wal-Mart, McClendon called Capers and Hill to inform them that the armored car was about to arrive at Wal-Mart. Once the armored car arrived, McClendon entered the Wal-Mart store and continued to talk to Capers on the phone. He informed them that they should get out of the car and wait at the Wal-Mart shopping cart chute. Wal-Mart employee Kirby Brewer testified to noticing Capers and Hill before the robbery standing outside the cart chute. Brewer also noticed that Capers was talking on the phone during this time.

During this period, Edward Bell, the armored car guard, entered the Wal-Mart and went into the cash office of the store. He made his delivery and picked up several bags of cash and checks. Still on the phone with Capers, McClendon informed him that the guard was coming out of the cash office. Thereafter, Capers and Hill entered the store by running through the store's cart chute and robbed Bell at gunpoint. Capers testified that prior to the robbery he placed his cell phone in his pocket, but did not hang up on McClendon. Capers stated that McClendon was still on the phone line during the entire robbery. After fleeing the store, Capers informed McClendon that they had made it across the street and were en route to the Ford plant, the group's prearranged meeting location for after the robbery. McClendon remained in the store for the duration of the robbery. Following the completion of the robbery, he purchased some shirts and pants and left the store.

Capers and Hill drove to the Ford plant to meet McClendon. The pair discarded the clothes they wore during the robbery, moved the cash into a new bag, discarded all of the checks, and took the stolen license plate off the car. McClendon arrived shortly thereafter, and the three men drove in McClendon's car to a local mall where McClendon gave the other two men money to buy a change of clothes. After leaving the mall, the three went back to McClendon's house and counted the cash. Capers recalled the count being $42,000, while Hill testified that they counted $40,000 in cash.

Capers testified that after the robbery, he and McClendon and McClendon's girlfriend Stacy drove to Toledo, Ohio, and Detroit, Michigan, where they purchased one kilogram of cocaine and twenty pounds of marijuana with the money from the robbery. He asserted that this had been McClendon's intention all along, so that they might increase their gain from the robbery. After arriving into Detroit, McClendon directed Capers to drive to a specific house, and McClendon entered the house. Capers testified that McClendon came out of the house with cocaine wrapped in aluminum foil. Capers also stated that when they returned to Louisville, he noticed about thirty pounds of marijuana in the car. Capers believed that McClendon must have placed the marijuana in the car while Capers was asleep at their motel.

Thereafter, police conducted an investigation, which eventually led to the arrest of Capers and Hill on March 23, 2006. Capers and Hill chose to cooperate with police and provided details of the robbery. Police corroborated Capers and Hill's information with Wal-Mart video surveillance footage and phone records. For instance, police believed that a person inside the store must have alerted Capers and Hill as to the most opportune moment to enter and rob the guard. Only certain

places in the store provided the vantage point necessary to see the guard. Images from the surveillance tape revealed that McClendon was in the store with a vantage point where he could see the guard.

Additionally, every surveillance image of McClendon showed him talking on a cell phone. Police took these images in conjunction with Capers' cell phone records, which showed that sixteen phone calls were made between Capers' 619-0720 number and a 767-0496 number. The records for these phones showed that there were calls made between the phones immediately before, during and after the robbery. Capers testified that 767-0496 was the phone number that McClendon was using on the date of the robbery. The 767-0496 number was listed in the name of Angelia Musulin, but she told police that she had never purchased a phone with this number. Musulin stated that she knew McClendon, had worked with him, and had been a babysitter for his children a few times. Police also relied on letters sent from McClendon to Angelia Musulin to tie McClendon to this phone. The letters urged Musulin to claim that she owned the cell phone number 767-0496.

Detective Larry Duncan arrested McClendon on August 22, 2006, pursuant to an arrest warrant. Detective Duncan read McClendon his rights and then transported him to police headquarters. McClendon waived his rights and was interrogated by Duncan and FBI Special Agent Greg Ahlers. After being confronted with the surveillance images, he admitted to being in the Wal-Mart that day, but he denied being involved in the robbery. He claimed all phone calls between himself and Capers concerned a trip to Detroit that the pair planned on taking. McClendon admitted to driving with Capers to Detroit, and once there, purchasing one kilogram of cocaine and twenty pounds of marijuana.

A federal grand jury charged McClendon with the following five offenses: interference with interstate commerce by threats or violence related to an attempted robbery of Wal-Mart on March 13, 2006, in violation of the Hobbs Act codified in 18 U.S.C. § 951(a) ("attempted robbery charge"); using and carrying a firearm during the attempted robbery charge, in violation of 18 U.S.C. § 924 (c)(1)(A); interference with interstate commerce by threats or violence related to the completed robbery of Wal-Mart on March 20, 2006, in violation of the Hobbs Act codified in 18 U.S.C. § 1951(a) ("completed robbery charge"); aiding and abetting the using, carrying, or brandishing of a firearm during completed robbery charge, in violation of 18 U.S.C. § 924 (c)(1)(A); conspiring to possess with intent to distribute 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(ii) ("drug conspiracy charge"); and two forfeiture counts. After a trial on these charges, a jury convicted McClendon of the completed robbery charge and the drug conspiracy charge and acquitted him of all other charges. The District Court sentenced McClendon to 240 months of imprisonment on the completed robbery charge and 360 months of imprisonment for the drug conspiracy charge, with the terms of imprisonment to run concurrently. The District Court also entered a restitution order against McClendon, jointly and severally with Capers and Hill, in the amount of $76,068.65. McClendon timely appealed.

After the initial appellate briefing in this case, McClendon obtained new counsel who moved to strike his original brief. This request was denied, but this Court provided McClendon's new counsel the opportunity to supplement McClendon's original brief. Both McClendon and the Government have since filed supplemental briefs for this Court's consideration. This opinion addresses all claims made from both the original and supplemental briefs.

## II. ANALYSIS

### *1. Sufficiency of the Evidence*

McClendon claims that his convictions were based on insufficient evidence. This Court reviews the sufficiency of the evidence to support a conviction by viewing the evidence in the light most favorable to the prosecution and determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While "more than just a scintilla" of evidence is required to sustain a conviction, circumstantial evidence alone is sufficient. *See United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995); *see also United States v. Vincent*, 20 F.3d 229, 233 (6th Cir. 1994). McClendon's burden "is very heavy because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the governments's favor." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). Further, "the uncorroborated testimony of an accomplice may support a conviction under federal law." *Sherlin*, 67 F.3d at 1214 (quoting *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986)).

### The Robbery Charge

The jury convicted McClendon of a violation of the Hobbs Act for his participation in the robbery. The Government must prove two elements to prevail on a Hobbs Act charge: "(1) interference with interstate commerce (2) in the course of a substantive criminal act." *Ostrander*, 411 F.3d at 691. First, robbing a business satisfies the first element of the Hobbs charge, so long as there is an effect on interstate commerce. *Id*. A national corporation such as Wal-Mart has an effect on interstate commerce. Second, the statute names robbery as a substantive criminal act, thus

satisfying the second element of the Hobbs charge. *See* 18 U.S.C. § 1951(a). Statements made by Capers and Hill implicating McClendon in the robbery would alone be sufficient to support his conviction. But their testimony is further corroborated by circumstantial evidence such as the phone records, the Wal-Mart surveillance video, and the letters McClendon sent to Angelia Musulin encouraging her to lie for him.

McClendon takes issue with the credibility of Capers and Hill, but we must ordinarily defer to the credibility determinations made by the jury where there is conflicting testimony. *See United States v. Jefferson*, 149 F.3d 444, 445 (6th Cir. 1998). The same is true concerning the credibility of Danielle Smith, Capers' girlfriend, who testified at trial to incriminating statements made by McClendon concerning the robbery.

Finally, McClendon contends that the prosecution presented no evidence tying him to the cell phone records in question. Both Capers and Hill testified at trial that this was the phone number that they used to communicate with McClendon both prior to and during the robbery. Further, this was the number that McClendon asked Angelia Musulin to claim as her own. McClendon had no reason to request this of Musulin if he had no connection to that phone number. In sum, there was sufficient evidence for a rational jury to convict McClendon of the robbery.

## The Drug Conspiracy Charge

The jury convicted McClendon for conspiring to possess with intent to distribute 500 grams or more of cocaine. McClendon's primary argument regarding his drug conviction is that Capers' testimony alone is not sufficient evidence to uphold his conviction. As noted above, the uncorroborated testimony of Capers is enough to support McClendon's conviction. In addition,

-8-

McClendon himself admitted in his post-arrest interview to traveling to Detroit to purchase drugs. Given the evidence presented against McClendon, a rational juror could have found the essential elements of the drug conspiracy charge beyond a reasonable doubt.

## 2. Reasonableness of the Sentence

McClendon next argues that his sentence was unreasonable pointing both to the amount of restitution and the term of imprisonment imposed. This Court reviews a sentence for both substantive and procedural reasonableness under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). Likewise, the amount of restitution is evaluated under this same standard. *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

## Criminal History Weighed Too Heavily

First, McClendon argues that his sentence was substantively unreasonable because the imposition of a 360 month sentence for the drug conspiracy charge conflicts with the sentencing mandate of 18 U.S.C. § 3553(a). A sentence is substantively unreasonable "when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 519-20 (6th Cir. 2008), *cert. denied* – U.S. –, 129 S.Ct. 450 (2008). There is a presumption of reasonableness when a sentence falls within the guidelines range. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). McClendon contends that his sentence violates the purposes of 18 U.S.C. § 3553(a) because the District Court allegedly gave greater weight to his prior criminal history than any other factor under the statute. *See* 18 U.S.C. § 3553(a) (articulating factors that District Court should weigh when sentencing a defendant). He asserts that

the District Court considered his criminal history four times when calculating his Guidelines range: "first with the increased statutory range, second with the career offender finding, third with the *increased* career offender offense level of 37 because the maximum sentence for the increased statutory range was life, and fourth with the increase of the criminal history category to VI." (Supplemental Br. of Appellant at 29.)(emphasis in original). But, McClendon also admits that his 360-month sentence is permissible under the Guidelines. Further, each of the enhancements that McClendon complains about are permissible under the Guidelines.

Having reviewed the presentence report on which the District Court relied and the sentencing hearing transcript, we find that the sentence rendered against McClendon was substantively reasonable. The District Court emphasized McClendon's criminal history, but also relied heavily on the seriousness of the crime and the "need to protect the public and promote respect for the law." (Transcript of Sentencing Hearing at 28.) The District Court evaluated and weighted the § 3553(a) factors appropriately when sentencing McClendon, and thus, his sentence is not substantively unreasonable.

**Amount of Restitution**

McClendon next contends that his sentence was unreasonable because the District Court improperly calculated the restitution order imposed against him. While this Court normally reviews a restitution order under an abuse of discretion standard, McClendon did not object to the amount of restitution at sentencing. Therefore, we review the District Court's order for plain error. McClendon seizes upon the fact that more than twenty-three thousand of the restitution amount was derived from checks.

Wal-Mart representative Robert Mangold testified that Wal-Mart's loss was $52,149.13 in cash and $23,919.02 in checks for a total of $76,085.65.[1] McClendon argues that it was procedurally unreasonable for the District Court to calculate restitution based on the amount of the checks because the government presented no evidence as to whether the checks were endorsed to or by Wal-Mart, whether the checks were used by McClendon or another party, or whether any of the money associated with the checks was recovered by Wal-Mart. He also notes that Capers and Hill each testified that the bounty received from the robbery was approximately $40,000. For support, McClendon directs us to *United States v. Dunn*, 300 F. App'x 336 (6th Cir. 2008), where this court struck down a sentence which impermissibly included interest when calculating loss to the victim for sentencing guidelines purposes.

This issue is distinguishable from *Dunn* because it involves a factual dispute over the amount of loss to the victim, not a procedural determination of loss calculation as in *Dunn*. Based on Wal-Mart's records and Mangold's testimony that the "pickup deposit report" indicated that $23,919.02 in checks had been stolen from the guard, the District Court did not plainly err in finding that amount had been lost by Wal-Mart in addition to the cash. The $40,000 bounty alleged by Capers and Hill was significantly less than the cash amount alone and was thus properly ignored by the Court in calculating the full amount for restitution.

### 3. *Motion to Suppress McClendon's Statement to Police*

---

[1]The record is unclear as to the $.50 disparity between the sum of the cash and check amounts and the restitution assessed.

McClendon claims that his post-arrest statements were involuntary because Detective Duncan coerced him into making them. He argues that the District Court erred by refusing to suppress these statements. McClendon argues that the total time of the questioning in conjunction with promises of leniency render the statements involuntary. Promises of leniency may be coercive when coupled with threats of imprisonment or prosecution. *See Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991); *see also United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003) (finding that "promises of leniency may be coercive if they are broken or illusory.") McClendon was in police custody for six hours and questioned for two of those hours. He did not consume food or drink during that time, but the record reflects that he never requested any. Detective Duncan informed McClendon of his *Miranda* rights at the time of arrest. Later, McClendon signed a waiver of rights form after reading the rights out loud. McClendon made the following statement at the end of his interrogation:

> Um, I would like to add the fact that, uh, Mr. Duncan has been truthful to me from the beginning ... Um, also I want to add the fact that this investigation was to my satisfaction. It-It ...it's not, I was not forced to tell anything. I was not forced to say anything. I was not coerced to nothing; never did I take a break – a 15-minute break to over-think things. We've talked straight through this. Um, I'm not gonna maintain a innocence or a guilt right now because that would just be stupid. But at the same time I just want to thank....on the record, I just want to thank Mr. Duncan and his partner uh, for the respect that they've shown me. Thank you.

(Government's Response to Def.'s Motion to Suppress Statement at 5-6.) Moreover, the record evidence does not support a conclusion that the District Court clearly erred in finding that "there was no promise of leniency." Supplemental Hr'g Tr. Vol. 2 at 173. Reviewing the totality of the

circumstances, we conclude that McClendon's statements were voluntarily given, and the District Court did not err when refusing to suppress them.

### *4. Exclusion of Private Investigator from the Courtroom*

McClendon next argues that the District Court abused its discretion by excluding his private investigator from the courtroom during the trial. Federal Rule of Evidence 615 allows a court to exclude witnesses from the courtroom "so that they cannot hear the testimony of other witnesses." Fed. R. Evid. 615. In addition to exempting a party from being sequestered, this rule does not authorize exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Fed. Rule Evid. 615(3).

After the District Court instituted "the rule" and sequestered all witnesses for the trial, McClendon asked the Court for leave to allow his investigator to be exempted and allowed to remain in the courtroom. McClendon's counsel informed the Court that the investigator was not an expert, but instead was providing impeachment and background information. Following reflection on the issue, the District Court denied this request, instead choosing to provide McClendon's counsel with frequent breaks to discuss the case with the investigator and allow the investigator to obtain transcripts from the other witnesses. McClendon claims that these modifications were insufficient because the investigator interviewed several government witnesses and could provide immediate insight to their cross-examinations if allowed to remain in the courtroom. We find that the District Court's modifications allowed McClendon's investigator to participate significantly in his defense and that the investigator's presence was not "essential." These frequent breaks provided ample opportunity for the private investigator to assist McClendon's counsel. Additionally, the Court gave

the investigator materials, such as access to the transcripts of witness testimony, that allowed him to aid defense counsel in the impeachment of witnesses and strategic defense planning. The District Court acted appropriately within its discretion. The decision to exclude the private investigator, and instead provide other modifications, did not prejudice McClendon's right to a fair trial.

### 5. *Court's Response to Jury Question*

Finally, McClendon claims that the District Court erred by failing to properly respond to a jury question. During deliberations, the jury submitted a question as to who had been identified as having the telephone number ending in 7086. McClendon claims that the District Court responded by making a "general reference to the previous instruction that the jury rely upon its recollection of the testimony." (Appellant's Supplemental Br. at 25.) According to McClendon, this response did not satisfy the Court's obligation to resolve jury questions "with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989).

However, the cited "concrete accuracy" language concerns questions of law, *Nunez*, 889 F.2d at 1569, whereas this case involves a question of fact. When the jury submits a factual question, instructing the jury to rely on its own recollection of the testimony is proper and "carefully preserve[s] the province of the jury while minimizing any prejudice to the defense or the prosecution." *United States v. Blanks*, No. 91-6084, 1992 WL 120205, at *2 (6th Cir. June 2, 1992)(per curiam); *See also Ramonez v. Berghuis*, 490 F.3d 482, 489 n. 7 (6th Cir. 2007). Moreover, McClendon notes that Detective Duncan "had testified at trial that he did not know whose phone number ended in 7086." (Appellant's Supplemental Br. at 25.) Thus, the answer to the jury's

question was apparently not contained in the record, making it unclear what else the Court could

have told the jury.

## V. CONCLUSION

The judgment of the District Court is affirmed.